| | | |
|---|---|---|
| TECHTRONIC INDUSTRIES CO., LTD. and RICHARD PANDO, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No. 05-C-4370 |
| CHERVON HOLDINGS LTD., NANJING CHERVON INDUSTRIAL CO., LTD., a/k/a CHERVON INDUSTRY CO., LTD., CHERVON LTD., and CHERVON NORTH AMERICA, INC., | ) ) ) ) ) ) | Judge Ruben Castillo |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Techtronic Industries Company, Limited ("TTi") and Richard Pando (together

"Techtronic") sued Chervon Holdings Limited, Nanjing Chervon Industrial Company, Limited,

Chervon, Limited, and Chervon North America, Incorporated (collectively "Chervon") alleging

patent infringement in violation of Title 35 of the United States Code. (R. 1, Compl. ¶ 7.)

Techtronic has moved this Court for a preliminary injunction to prevent Chervon from infringing

U.S. patent 6,382,574, held by Richard Pando ("the Pando patent").[1]  For the reasons set forth

below, we grant Techtronic's motion for a preliminary injunction. (R. 13-1.)

### RELEVANT FACTS

TTi is a manufacturer of power tools that has an exclusive license to the Pando patent.

(R. 17, Pl.'s Mem., Ex. 4, Winn Decl. ¶ 2; Ex. 5, Pando Decl. ¶ 4.)  TTi sells products under the

---

[1]This Court initially referred the parties to Magistrate Judge Levin for a hearing and report and recommendation on Techtronic's motion.  After conducting a hearing, Magistrate Judge Levin recommended that we grant Techtronic's motion.  After reviewing his findings, this Court declined to adopt that recommendation. (R. 36, 9/15/2005 Order.)

Ryobi® brand, among others. (*Id.*, Ex. 4, Winn Decl. ¶ 4.) One of the products that TTi sells under the Ryobi® brand is a suction-mounted laser level product known as the AIRgrip™ Laser Level. (*Id.* ¶ 6.) TTi spent sixteen months and more than 2 million dollars to design and develop this product. (*Id.* ¶ 7.) The Ryobi® AIRgrip™ is sold exclusively in The Home Depot stores across the United States. (*Id.* ¶ 10.) During discussions to set up its exclusive relationship with The Home Depot, TTi informed The Home Depot that TTi has patent protection for the AIRgrip™ resulting from its exclusive license to the Pando patent. (*Id.* ¶ 9.) Since it began selling the AIRgrip™ in September 2004, The Home Depot has sold more than 500,000 units of the product. (*Id.* ¶ 11.)

Chervon is also in the business of manufacturing and selling power tools. (R. 15, Defs.' Exs., Ex. S, Turoff Decl. ¶ 2.)[2] This dispute arises out of Chervon's development of a laser level with a motorized suction base which it plans to market through Sears as the Craftsman® Accu-line Laser Trac™ Level Model 48253 ("the Chervon device"). (*Id.* ¶ 6; R. 17, Pls.' Mem., Ex. 2, Karvelis Decl. ¶ 17.) Sears has announced that this product will be available for retail in October 2005. (R. 17, Pls.' Mem., Ex. 2, Karvelis Decl. ¶ 17.) Techtronic alleges that the Chervon device directly infringes upon the Pando patent and seeks preliminary injunctive relief to prevent Chervon from further infringement.

## LEGAL STANDARDS

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v.*

---

[2]Chervon filed its benchbook of exhibits supporting its opposition to Techtronic's motion for a preliminary injunction under seal. This Court has taken great care not to reveal any confidential or proprietary information in the course of this opinion.

*Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original) (quoting 11A C. Wright, A. Miller, & M. Kane, Fed. Practice & Procedure § 2948, pp. 129-30 (2d ed. 1995)); *National Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1324 (Fed. Cir. 2004). The moving party is only entitled to a preliminary injunction if it can demonstrate: (1) a reasonable likelihood of success on the merits; (2) irreparable harm in the absence of a preliminary injunction; (3) the balance of hardships tips in the movant's favor; and (4) the injunction has a favorable impact on the public interest.[3] *Amazon.com, Inc. v. BarnesandNoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001). None of these factors, taken individually, is dispositive because a district court must weigh each factor against the others and against the relief requested. *Hybritech*, 849 F.2d at 1451. The moving party, however, "cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm." *Amazon.com*, 239 F.3d at 1350 (emphasis in original).

## ANALYSIS

Techtronic argues that it has shown a high likelihood of success on the merits of its infringement claim, that Chervon's pending release of the Chervon device will irreparably harm its market share and customer relationships, and that the balance of hardships and public interest factors weigh in its favor. Chervon argues that Techtronic satisfies none of the preliminary injunction factors and challenges both the Pando patent's validity and Techtronic's assertion that the Chervon device infringes that patent.

---

[3]The law of the Federal Circuit Court of Appeals governs the issuance of preliminary injunctions in patent infringement cases. *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988).

3

## I. Reasonable Likelihood of Success on the Merits

Because Chervon has challenged the validity of the Pando patent, we must consider Techtronic's likelihood of succeeding both on the merits of its infringement claim and in defending against Chervon's validity challenge. Both of these considerations involve a two-step analysis. The first step is the same for both the infringement and validity analyses: we must determine, as a matter of law, the proper scope and meaning of the asserted patent claims. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003). The second step of the validity analysis requires us to compare the asserted patent claim with the prior art referenced by the alleged infringer and to determine whether "each and every limitation is found either expressly or inherently in a single prior art reference" or whether the claim "would have been obvious within the meaning of 35 U.S.C. § 103." *Id.* (quoting *Celeritas Techs. Inc. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998)). Similarly, under step two of the infringement analysis we must compare the claim to the accused device and determine whether "every claim limitation or its equivalent [can] be found in the accused device." *Id.*

### A. Claim Construction

The only claim of the Pando patent that is in dispute for the purposes of the preliminary injunction motion is claim 1, which reads as follows:

> A self-mounting device, comprising:
>
> a suction cup that cooperates with an uneven and immobile surface to define a suction space, wherein the uneven and immobile surface allows for influx of air into the suction space;
>
> a motor coupled to a suction pump that cooperates with the suction space to create a vacuum in the suction space and that removes the air from the suction space; and

an article supporting portion other than a handle that is mechanically coupled to the suction cup, wherein the article supporting portion is configured to support an article in a fixed relationship with respect to the uneven and immobile surface.

(R. 17, Pls.' Mem., Ex. 1, Pando Patent, col. 6, lns. 4-17.) There are only two aspects of the construction of claim 1 over which the parties disagree. The first is the meaning of the term "uneven." The second is whether claim 1 claims a combination of a "self-mounting device" and an "uneven and immobile surface" or whether it claims the self-mounting device alone. (R. 21, Def.'s Resp. at 9-11; R. 19, Pls.' Reply at 1-3, 4-7.)

In construing a patent claim, a district court must generally give the words of the claim "their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The ordinary and customary meaning of a term is determined by what a person of ordinary skill in the art would understand the term to mean at the time of the invention. *Id.* at 1313. The court begins its claim construction by considering the intrinsic evidence, which includes the claim language, the remainder of the specification, and the prosecution history. *Id.* at 1314. The claim language itself is the most important guide. *See id.*; *Middleton, Inc. v. Minnesota Mining & Mfg. Co.*, 311 F.3d 1384, 1387 (Fed. Cir. 2002) (stating that "the most important indicator of the meaning" of a disputed term "is its usage and context within the claim itself"); *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 619 (Fed. Cir. 1995) (noting that "[f]irst, and most importantly, the language of the claim defines the scope of the protected invention"). If the claim language is clear, then "it is improper for the court to rely on extrinsic evidence such as expert testimony for purposes of claim construction." *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997). Where the claim language is not plain,

"[t]he best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history." *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed Cir. 1998).

A court may also rely on extrinsic evidence to construe a claim where it is useful to a determination of the claim's ordinary meaning, but this evidence is less significant than the intrinsic record. *Phillips*, 415 F.3d at 1317. Extrinsic evidence includes "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 1317 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)). While this evidence can be useful in determining the true meaning of the relevant art, it is less significant to claim construction than the intrinsic evidence. *Id.*

### 1. Meaning of the Term "Uneven"

A key issue for the resolution of this motion is the meaning of the term "uneven" in the context of claim 1. The term "uneven" is generally understood to mean not smooth.[4] The meaning of "uneven" within the context of claim 1, however, is even more specific. The claim references an "uneven and immobile surface . . . wherein the uneven and immobile surface allows for influx of air into the suction space." (R. 17, Pls.' Mem., Ex. 1, Pando Patent, col. 6, lns. 5-8.) Based on the plain language of the claim, we construe the meaning of "uneven" in the claim's description of a surface as one that is "sufficiently non-smooth as to allow for the influx of air around a suction cup."

---

[4]This ordinary meaning is also found in Webster's Dictionary, which defines "uneven" as not level, smooth, or flat; rough; irregular . . . ." (R. 15, Defs.' Exs., Ex. F, Webster's New World Dictionary Excerpt.)

In reaching this preliminary construction, we have also relied on the specification and prosecution history. The patent's specification states that "[c]ontemplated surfaces need not be smooth, but may alternatively be uneven, or have cracks or crevices." (*Id.*, col. 2, lns. 55-57.) It also states that the invention is meant "to be affixed to a stationary suction surface, in which an undesired influx of air can be automatically removed." (*Id.*, col. 2, lns. 14-16.) This reinforces our construction that the surface must be sufficiently non-smooth as to allow for the introduction of air when a suction cup is applied. The prosecution history also supports our construction. In differentiating his claim from the Maznik patent, U.S. 5,630,517, Pando remarked that:

> *Maznik* further teaches that his '. . . apparatus can be . . . mounted to any smooth surface . . .' . . . however, [it] fails to teach an uneven and immobile surface. On the contrary, a smooth surface is entirely inconsistent with an uneven surface as expressly required in amended claim 1.

(R. 15, Defs.' Exs., Ex. E, Pros. Hist. at 68.) He later reiterated the distinction between "uneven" and "smooth" in another defense against the Maznik patent as prior art. (*Id.* at 83.)

Although we have derived our construction of the term "uneven" from our review of the intrinsic evidence in this case, we also note that support for our construction can be found in the extrinsic expert testimony that both parties offered in this case. Techtronic's expert, Albert V. Karvelis, defines the "uneven" limitation in the suction cup reference as a "suction cup that acts together with a fixed surface which *is not smooth enough to prevent leakage of air*, to form a vacuum chamber into which the air leaks." (R. 17, Pls.' Mem., Ex. 2, Karvelis Decl. ¶ 28 (emphasis added).) Chervon's expert, Allan S. Myerson, gives a surprisingly similar explanation, stating that "the term 'uneven' as used in the [Pando] patent, should be construed as meaning non-smooth." (R. 15, Defs.' Exs., Ex. A, Myerson Decl. ¶ 21.) He also explained that

7

"[a]n uneven surface is one that permits air to flow around the suction cup and to enter the suction space." (*Id.* ¶ 25.) Dr. Myerson even noted his agreement with Dr. Karvelis on this point. (*Id.* ¶ 26.)

Chervon has attempted to limit the scope of this term, however, by arguing that the term "uneven" as used in claim 1 should be limited to the following surfaces: a crude concrete wall, block or brick wall, unfinished wood, and tile wall. (R. 21, Defs.' Resp. at 10.) No such limitation is found in the claim language itself. The patent specification rejects Chervon's proposed limitation, stating that:

> Contemplated surfaces need not be smooth, but may alternatively be uneven, or have cracks or crevices. For example, contemplated surfaces include crude concrete walls, block or brick walls, unfinished wood, and tile walls having spaces partially filled with grout.

(R. 17, Pls.' Mem., Ex. 1, Pando Patent, col. 2, lns. 55-59.) The plain language of this text indicates that the specified surfaces constitute a non-exhaustive list of contemplated examples rather than a limitation of the specific surface types with which the self-mounting device can be used.

Chervon's only support for its proposed limitation is the patent examiner's statement in the prosecution history that Pando "defines an uneven immobile surface as a crude concrete wall, block or brick walls, unfinished wood, and tile wall." (R. 15, Defs. Exs., Ex. E, Pros. Hist. at 79.) Chervon fails to note, however, that in response to this statement, Pando specified that those surfaces were merely examples, stating that "[t]he present specification explicitly defines a static surface as an 'uneven,' . . . 'immobile . . . object, *for example*, a wall, . . . crude concrete walls, block or brick walls, . . . and tile walls . . . ." (*Id.* at 83-84 (emphasis added).) Pando's

characterization, and not the examiner's prior statement, is consistent with the specification language. We find that the Pando patent's specification, coupled with Pando's statements in the prosecution history, do not support Chervon's proposed limitation of the term "uneven" in claim 1 to those surfaces explicitly named in the patent specification.

## 2. Combination of Device and Surface

The parties also hotly contest whether claim 1 is directed to the self-mounting device alone, or whether it is directed to a combination of the device and the "uneven and immobile surface." (R. 21, Defs.' Resp. at 9, 11; R. 19, Pls.' Reply at 4-7.) Chervon argues that the prosecution history demonstrates that Pando limited the claims to a combination of the self-mounting device and the surface on which the device is mounted. (R. 21, Defs.' Resp. at 9.) In support of this construction, Myerson states that "[b]ased on my review, the file history demonstrates that the claims were limited, during prosecution, to the combination of the self-mounting device and the surface[.]" (R. 15, Defs.' Exs., Ex. A, Myerson Decl. ¶ 26.)

We find that the plain language of claim 1 does not support Chervon's proposed limitation. Claim one describes "[a] self-mounting device, comprising: a suction cup *that cooperates with* an uneven and immobile surface to define a suction space[.]" (R. 17, Pls.' Mem., Ex. 1, Pando Patent, col. 6, lns. 4-6 (emphasis added).) The claim thus identifies a suction cup as a component of the self-mounting device and then describes how that component interacts with a specific type of surface. The role of the "surface" in the claim language is to describe how the suction device functions in creating a suction space. This construction is supported by the patent's specification, which states that the Pando patent meets the need for a suction device that deals with the problem of air leakage by providing "a vacuum suction device

9

that is used to be affixed to a stationary suction surface, in which an undesired influx of air can be automatically removed." (*Id.*, col. 2, lns. 8-19.) In describing how the self-mounting device works, the specification states that "the device is juxtaposed to a wall or other static surface, the motor is engaged, and the vacuum generator creates a sufficient vacuum at the suction cup to hold the device to the wall." (*Id.*, col. 2, lns. 50-53.) These references in the patent specification support our view that the surface reference is included in claim 1 to describe how the self-mounting device operates. Nothing in the claim language or specification indicates that claim 1 identifies the surface as part of the patented device itself.

Though we find that the claim and specification language is clear, the prosecution history on this issue is somewhat muddled. As originally filed, the patent application preamble noted that the patent covered "a self-mounting device to support an article with respect to a static surface . . . ." (R. 15, Defs.' Exs., Ex. E, Pros. Hist. at 29-30.) The examiner asked Pando to indicate whether he intended to claim the self-mounting device alone or the combination of the self-mounting device and the static surface. (*Id.* at 30.) Specifically, the examiner stated:

> [i]f applicant indicates by amendment that the combination claim is the intention, the language in the preamble should be made consistent with the language in the body of the claims. If the intent is to claim the subcombination, then the body of the claims must be amended to remove positive recitation of the combination.

(*Id.* at 31.) In response, Pando amended claim one to read simply: "[a] self-mounting device, comprising . . . ." (*Id.* at 38.) Pando explained that he made the amendment "to more clearly indicate a combination claim." (*Id.*)

The Federal Circuit recently acknowledged that "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final

product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317. We find that this observation applies here. Pando's response to the examiner's inquiry regarding the scope of claim 1 could be read in two different ways. First, his amendment of the preamble and statement that the amendment was made "to more clearly indicate a combination claim" could indicate that he intended the claim to include a combination of the device and the surface. It is also possible, however, that Pando removed the reference to the surface from the preamble to obviate that claim 1 covered only the device itself. He did not follow the examiner's suggestion to change the preamble to be consistent with the language in the body of claim 1 if he wished to claim the device in combination with the surface. As Techtronic has suggested, Pando's reference to a "combination claim" could have referenced the combination of the three elements of the claim. Because Pando did not adopt either of the Examiner's suggestions, we simply cannot divine his true intention from the prosecution history. Thus we cannot find a clear intent on Pando's part to limit the scope of claim one to a combination of the self-mounting device and a surface. *See id.*; *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1345 (Fed. Cir. 2005).

## B. Validity

Chervon has challenged the validity of the Pando patent, arguing that it was anticipated and rendered obvious by prior art.[5] Whether a patent is valid is a question of law. *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1562 (Fed. Cir. 1988). In order to establish that a prior art renders a patent invalid, the challenger must compare the patent claims with the prior

---

[5] We note that rather than providing a full explanation of its validity challenge in its brief, Chervon's entire argument is referenced through a footnote in which it directs the Court to Myerson's declaration. (R. 21, Defs.' Resp. at 8.)

art. *Oakley*, 316 F.3d at 1339. The district court must assess the meaning of the prior art references, which is a question of fact. *Amazon.com*, 239 F.3d at 1358. While a patent is presumed valid under federal law, *see* 35 U.S.C. § 282, that presumption does not relieve the moving party in the preliminary injunction context from carrying its normal burden of establishing its reasonable likelihood of prevailing, *New England Braiding Company, Inc. v. A.W. Chesterton Company*, 970 F.2d 878, 882 (Fed. Cir. 1992). At the preliminary injunction stage, the district court does not resolve the validity question but rather assesses the persuasiveness of the challenger's evidence. *Id.* at 882-83. As a result, a district court will only decline to issue a preliminary injunction on validity grounds if the party attacking validity "raises a substantial question concerning infringement or validity, meaning that it asserts a defense that the party seeking the injunction cannot prove lacks substantial merit." *Oakley*, 316 F.3d at 1340 (internal quotation omitted); *New England Braiding*, 970 F.2d at 882-83.

### 1. Anticipation

Here, Chervon challenges the validity of the Pando patent based on Myerson's conclusion that claim 1 is "anticipated by at least each of U.S. Patent Nos. 3,915,241 ['the '241 patent']; 4,058,281 ['the '281 patent']; and 5,795,001 ['the '001 patent.']" (R. 21, Defs.' Resp. at 8.) "Anticipation under 35 U.S.C. § 102 means lack of novelty, and is a question of fact." *Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001). A patent is anticipated if every limitation is found either expressly or inherently in a single prior art reference. *Id.*; *Oakley*, 316 F.3d at 1339; *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1476 (Fed. Cir. 1997). In other words, "anticipation requires identity." Robert L. Harmon, Patents and the Federal Circuit 93 (6th ed. 2003). We cannot find that Chervon has raised a substantial question as to whether the Pando

patent is invalid on an anticipation theory because Chervon has not demonstrated that every limitation of the Pando patent is found in the cited prior art references.

### a.    The '241 Patent

The '241 patent describes a "method and apparatus for temporarily securing a tool to a supporting surface." (R. 15, Defs.' Exs., Ex. H, '241 Patent.) The patent claims an apparatus "comprising a rigid suction bell . . . a vacuum connection opening in said bell for evacuation of said bell . . . and at least three supporting legs rigidly affixed to said bell . . . ." (*Id.*, col. 5, lns. 32-43.) Myerson provides no explanation for his conclusion that a "suction bell" is equivalent to a "suction cup." (*See id.*, Ex. I, Claim Comp. at 1.) The plain language of the '241 patent differentiates between a suction cup and a suction bell, identifying them as two different forms of suction devices. (R. 15, Defs.' Exs., Ex. H, '241 Patent, col. 1, lns. 35-37.) An anticipation finding requires a prior art reference to "disclose each and every element of the claim with sufficient clarity to prove its existence in the prior art." *Motorola*, 121 F.3d at 1473. Based on our review of the plain language, we cannot find such clarity of identity between the Pando patent's claim of a suction cup and the '241 patent's claim of a suction bell.

The patents also differ because the suction bell in the '241 patent is supported by at least three supporting legs. (R. 15, Defs.' Exs., Ex. H, '241 Patent, col. 2, lns. 8-29, col. 5, lns. 32-47.) The Pando patent, on the other hand, describes a "self-mounting device" in which the suction cup secures to a surface without any supporting features. (R. 17, Pls.' Mem., Ex. 1, Pando Patent, col. 6, lns. 4-8.) The purpose of the suction cup in the Pando patent is to allow for mounting without the need for other support. Moreover, in the Pando patent, the motor and article supporting portion are "coupled" to the suction cup and pump, (*id.*, col. 6, lns. 8-14),

while the vacuum source and motor described in the '241 patent are remote from the suction bell and apparatus, (R. 15, Defs.' Exs., Ex. H, '241 Patent, col. 3, lns. 23-38). Based on our comparison of the patent language, we cannot find that Chervon has raised a substantial question regarding the validity of the Pando patent that Techtronic cannot prove lacks substantial merit.

<h3 style="text-align:center"><b>b.    The '281 Patent</b></h3>

Nor is there identity between the limitations of the Pando patent and the '281 patent, which describes a "high vacuum fastener." (*Id.*, Ex. J, '281 Patent.) First, the '281 patent claims "[a] vacuum device for securement against *a flat surface* and capable of maintaining a vacuum against the surface by means of an external vacuum source comprising . . . sealing means disposed in said closed peripheral groove defining a vacuum retaining area with *the flat surface* . . ." (*Id.*, col. 3, lns. 42-45, 49-51 (emphasis added).) Thus, while the Pando patent claims a suction device for use against an uneven surface, the '281 patent specifically discloses a vacuum device for use against a flat surface. Chervon cannot argue that this distinction makes no difference for validity purposes while arguing that it makes every difference for its infringement claim. We find that the '281 patent's express language limiting the purpose of the device to use against a flat surface demonstrates a lack of identity between it and the Pando patent.

Second, there is no suction cup referenced in the '281 patent; instead, it references a sealing means comprising an "O-ring disposed in said peripheral groove and extending partially out of the plane of said first smooth surface." (*Id.*, col. 4, lns. 14-17.) According to the '281 patent, the O-ring defines the enclosed vacuum retaining area, but the vacuum pump creates the necessary air pressure within the enclosed area that the O-ring defines. (*Id.*, col. 2, lns. 45-47, 54-62.) The suction cup described in the Pando patent, on the other hand, can be affixed to a

stationary surface and then an undesired influx of air is removed by operating the motorized suction pump. Moreover, the O-ring in the '281 patent is "frictionally receiv[ed]" in an annular slot in the peripheral edges of a surrounding block and thereby defines the enclosed vacuum retaining area. (*Id.*, col. 2, lns. 44-47; col. 3, lns. 49-51.) In the Pando patent, the suction cup defines a suction space directly with the uneven surface. Myerson gives no explanation for his conclusion that an O-ring is the same as a suction cup. Instead, he simply states that Karvelis agreed that this is the case. (*Id.* Ex. A, Myerson Decl. ¶ 35.) Karvelis did not make such an admission; instead, he simply testified that an O-ring could be *used* as a suction cup in certain circumstances. (*Id.*, Ex. D, Karvelis Dep. at 27, lns. 9-11.) That two elements of separate patents can accomplish the same function does not make them equal.

Finally, the second element claimed in the Pando patent is a motor coupled to a suction pump. (R. 17, Pls.' Mem., Ex. 1, Pando Patent, col. 6, ln. 9.) The '281 patent does not claim a motor. (*Id.*, Ex. J, '281 Patent, cols. 3 & 4; Ex. K, Claim Comp. at 2-3.) Instead, it claims an "external vacuum source" that works with a needle valve pin that allows air to evacuate through an opening in the vacuum chamber. (*Id.*, Ex. J, '281 Patent, col. 3, lns. 44-45, 52-56 & col. 4, lns. 1-13.) Comparing the plain language of the two patents, we cannot say that the '281 patent discloses a motor coupled to a suction cup. As a result, we find that Chervon has not raised a substantial question as to whether the '281 patent anticipates the Pando patent. *Oakley*, 316 F.3d at 1339-40.

### c.    The '001 Patent

Finally, we find that Chervon has not raised a substantial question regarding whether the '001 patent anticipates the Pando patent. The fact that the examiner who reviewed the Pando

patent expressly compared it to the '001 patent makes it especially difficult for Chervon to establish a substantial question that the '001 patent anticipates the Pando patent. (R. 17, Pls.' Mem., Ex. 1, Pando Patent, col. 1, lns. 46-50; col. 5, lns. 28-32); *see Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004); *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1367-68 (Fed. Cir. 2004). Myerson states that the examiner did not consider whether the '001 patent's "surface 36" could qualify as an article supporting portion. (R. 15, Defs. Exs., Ex. A, Myerson Decl. ¶ 38.) The '001 patent specifically refers to surface 36 as a "handle grip portion." (*Id.*, Ex. L, '001 Patent, col. 2, lns. 64-67, col. 5, ln. 39, col. 6, ln. 18.) Claim 1 of the Pando patent, however, specifically claims "an article supporting portion other than a handle[.]" (R. 17, Pls. Mem, Ex. 1, Pando Patent, col. 6, ln. 13.) Thus surface 36 does not describe the same element as the article supporting portion in the Pando patent.

Because we have found that Myerson's conclusions regarding the prior art's anticipation of the Pando patent are not supported by the plain language of the prior art, we cannot find that Chervon has raised a substantial question regarding the Pando patent's validity based on its anticipation theory that Techtronic cannot prove lacks substantial merit. *See Motorola*, 121 F.3d at 1476 (noting that "[a]n expert's conclusory testimony, unsupported by the documentary evidence, cannot supplant the requirement of anticipatory disclosure in the prior art reference itself."). Though Chervon makes much ado about Techtronic's failure to provide expert testimony supporting the validity of the Pando patent, (R. 21, Defs.' Resp. at 7-8), the Federal Circuit has made clear that expert testimony is not necessary to rebut a validity challenge, *see Avia Group Int'l*, 853 F.2d at 1564. Techtronic properly relies on the plain language of the prior art to show that the Pando patent was not anticipated. (R. 19, Pls.' Reply at 8-11.) Additionally,

Techtronic has submitted Richard Pando's declaration which demonstrates that other companies in the industry were unable to obtain rights to the patent due to Pando's exclusive licensing arrangement with TTi. (R. 17, Pls.' Mem., Ex. 5, Pando Decl. ¶¶ 4-6.) Such evidence of industry acquiescence in the patent's validity lends further support to our anticipation findings. *See Amazon.com*, 239 F.3d at 1359. For all of these reasons, we disagree with Chervon's contention that Techtronic has failed to rebut its validity challenge.

## 2. Obviousness

Chervon also argues that the Pando patent is rendered obvious by U.S. Patent No. 5,063,679 ("the '679 patent").[6] (R. 21, Defs.' Resp. at 8.) A patent is obvious if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). While a patent is presumed valid, 35 U.S.C. § 282, a court must hold a patent invalid if it is clear that the invention as a whole would have been obvious in light of prior art, *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1566 (Fed. Cir. 1987). To avoid situations in which district courts make obviousness findings based on the benefits of hindsight, the Federal Circuit requires actual evidence of a suggestion, teaching, or motivation to combine prior art references to support a validity challenge based on obviousness. *Ecolochem, Inc. v. Southern Cal. Edison Co.*, 227 F.3d 1361, 1371-72 (Fed. Cir. 2000); *see also Nat'l Steel Car*, 357 F.3d at 1337.

---

[6]Again, Chervon's entire obviousness argument is found in one sentence of a footnote in its response brief, where it says that the Pando patent is "rendered obvious by [the '679 patent] in view of admissions in the [Pando] patent, the testimony of TTi's expert Dr. Karvelis or [the '241 or '001 patents]." (R. 21, Defs.' Resp. at 8.)

Whether a patent is obvious is a question of law based on factual inquiries. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). The court reviewing an obviousness challenge must consider four criteria: (1) a determination of the scope and content of the prior art; (2) a determination of the differences between the prior art and the claims at issue; (3) a determination of the level of ordinary skill in the pertinent art; and (4) a determination of which, if any, secondary considerations—or objective evidence of nonobviousness—are relevant and the effect of those secondary considerations. *Id.* at 17-18; *Mitsubishi Elec. Corp. v. Ampex Corp.*, 190 F.3d 1300, 1308-09 (Fed. Cir. 1999). Secondary considerations include "commercial success, long felt but unsolved need for the invention, the failure of others, and copying of the claimed invention." *For Your Ease Only, Inc. v. Natural Sci. Indus., Ltd.*, 02-C-1584, 2003 WL 22112997, *3 (N.D. Ill. Sept. 10, 2003), *aff'd*, 101 Fed. Appx. 356 (Fed. Cir. Jun. 24, 2004) (citing *Graham*, 383 U.S. at 17).

Chervon rests its obviousness challenge on Myerson's declaration. Myerson declares that every element of claim 1 of the Pando patent exists in the '679 patent except for the motor coupled to the vacuum pump. (R. 15, Defs.' Exs., Ex. A, Myerson Decl. ¶ 39.) Myerson further states: "[i]t is my understanding that it was well known in the art, at the time that the invention of [the Pando] patent was made, to use a motor coupled to a vacuum pump to remove air from the suction space." (*Id.*) The only facts Myerson cites to support his "understanding" is Karvelis's deposition and a blanket reference to the prior art cited in support of Chervon's anticipation defense. (*Id.* ¶ 40.)

Karvelis acknowledged that the '001 patent has a feature consisting of a motor and a suction cup. (*Id.*, Ex. D, Karvelis Dep. at 109.) As previously discussed, however, the patent

examiner specifically referenced the '001 patent during a rigorous and on-going examination of the Pando patent. (R. 17, Pls.' Mem., Ex. 1, Pando Patent, col. 1, lns. 46-50, col. 5, lns. 28-29.) After noting the existence of prior art—such as the '001 patent—that utilize a vacuum source in connection with a vacuum suction device, the examiner found that none of the prior art coupled the elements of claim 1 as the Pando patent had. (*Id.* col. 2, lns. 16-19.) As the patent examiner did not consider Pando's invention obvious based on the existence of the '001 patent and other prior art, Chervon's burden is particularly high in making that argument here. *See Glaxo Group*, 376 F.3d at 1348; *Hewlitt Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990).

The only evidence other than Karvelis's statement and the Pando patent that Myerson offers in support of the obviousness defense is his blanket contention that "several of the prior art patents previously discussed illustrate that the use of such a combination of a motor and a suction cup was known." (R. 15, Defs.' Exs, Ex. A, Myerson Decl. ¶ 40.) Even crediting that blanket assertion, Myerson has not demonstrated why or how the knowledge that a motor could be used in combination with a suction device renders Pando's invention as a whole obvious to a person ordinarily skilled in the art. Pando's idea was to couple the motorized suction device together with an article supporting portion and to use that motorized suction device to prevent the leakage of air from uneven surfaces. The patent examiner recognized that this was a new idea. (R. 17, Pls.' Mem., Ex. 1, Pando Patent, col. 2, lns. 8-19.) Chervon has presented no evidence that indicates that the prior art provide any suggestion, teaching, or motivation to create the device that Pando invented. *See Ecolochem*, 227 F.3d at 1371-72.

Though Chervon has neglected the *Graham* analysis for obviousness, it is nonetheless our

duty to review Chervon's challenge against that analytical framework. As for the first factor, the '679 patent claims an adjustable protractor bubble level that includes a suction cup as an affixing means. (R. 15, Defs.' Exs., Ex. N, '679 Patent, col. 6, lns. 11-12, 44-46.) That invention was intended for use as a leveling device that is adapted for rapid affixation to a power tool or other device. (*Id.*, col. 1, lns. 5-10.) Thus the scope of the '679 patent is much more limited than the Pando patent, which claims a more general self-mounting device that can be used for many different purposes—not just as a level. Under the second factor, Myerson acknowledges that the '679 prior art does not include a motor coupled to a vacuum pump, which is a key element of claim 1 of the Pando patent. There is no evidence on the third factor—identification of a person ordinarily skilled in the art—so we find it has a neutral effect.

Finally, we find that secondary considerations weigh against Chervon's obviousness challenge. Though we agree with Chervon that Techtronic has provided no evidence that the commercial success of the AIRgrip™ is attributable to the Pando patent, we find that other secondary considerations weigh in Techtronic's favor. Specifically, the examiner noted that the Pando invention satisfies a previously unmet need to provide a suction device by which an undesired influx of air can be automatically removed when it is attached to a static surface. (R. 17, Pls.' Mem., Ex. 1, Pando Patent, col. 2, lns. 16-19.) The examiner also noted that while others had designed suction devices to be affixed to static surfaces, they had failed to resolve the problem of the undesired influx of air when a device is attached to an uneven surface. (*Id.* col. 2, lns. 8-19.) Thus secondary considerations weigh against a finding of obviousness.

For all of these reasons, we find that Chervon has not raised a substantial question regarding the validity of the Pando patent based on obviousness. As a result, we will proceed to

the infringement claim.

### b.    Infringement

Techtronic argues that it is likely to prove at trial both that Chervon is liable for direct infringement of the Pando patent and for inducing Sears and other trade show attendees to infringe the Pando patent. (R. 17, Pls.' Mem. at 11 & n.4.) Whether or not an accused device infringes on a patent is a question of fact. *Oakley*, 316 F.3d at 1339. In reviewing an infringement claim, the district court compares the patent claim to the accused device. *Id.* The accused device only infringes if "every claim limitation or its equivalent [is] found in the accused device." *Id.*; *Amazon.com*, 239 F.3d at 1351. To support an inducement of infringement claim, the moving party must establish actual induction of infringement and that the alleged infringer had specific intent to encourage another's infringement. *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1061 (Fed. Cir. 2004); *Minnesota Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304-05 (Fed. Cir. 2002).

In support of its infringement claim, Techtronic has submitted the supplemental declaration of Karvelis, who tested a sample of the Chervon device.[7] (R. 37-2, Supp. Karvelis Decl.) Karvelis notes that the packaging for the accused device shows that the motorized suction cup base is intended for use on painted interior walls and that the Operator's Manual

---

[7]Initially, Techtronic rested its infringement claim on Karvelis's examination of a press release describing the accused device because no sample was commercially available. (*See* R. 19, Pls.' Reply at 2 n.1.) Chervon has asked the Court to ignore Karvelis's supplemental declaration because it has not had the chance to depose Karvelis regarding its contents. (R. 41, Defs.' Resp. to Suppl. Decl. at 5.) We decline to do so, because Karvelis's supplemental declaration is helpful in our resolution of the current motion and because Chervon was given sufficient time to evaluate and respond to the supplemental declaration despite its inability to depose Karvelis a second time.

recommends use of the suction cup base on "lightly textured surfaces such as; painted walls . . . ." (*Id.* ¶ 5.) After testing the device, Karvelis concluded that the "self-mounting motorized suction cup base allows for attachment to fixed surfaces that are uneven and that allow for an influx of air into the suction space between the suction cup and the surface." (*Id.* ¶ 9.) His testing demonstrated that the suction cup affixed itself to smooth surfaces such as a glass window and a mirror without need for the motorized device, but the suction cup would not adhere to a painted drywall surface unless the motor was engaged. (*Id.* ¶¶ 10-11.) As a result, Karvelis concluded that "the motor is included in the Chervon device for the purpose of attaching it to uneven surfaces[.]" (*Id.* ¶ 10.)

Karvelis also conducted a comparison of the elements of claim 1 of the Pando patent and the elements of the Chervon device's air suction base. (*Id.*, Ex. D, Claim Comp.) Karvelis found that every element of claim 1 is present in the Chervon device. First, he found that the Chervon device contains a suction cup that is intended for use on surfaces that are not smooth enough to prevent leakage of air. (*Id.*) Second, he found that the Chervon device includes a battery-operated electric motor coupled to a suction pump that cooperates with the suction space to remove air. (*Id.*) Finally, he found that the Chervon device includes a non-handle article support that is mechanically connected to the suction cup and is configured to remain level with respect to an uneven surface. (*Id.*)

Chervon makes two arguments in response to Techtronic's infringement claims: first, it argues that its device cannot infringe because it does not sell the surface on which the self-mounting device attaches; and second, it argues that its device cannot infringe because it is not recommended for use on uneven surfaces. (R. 21, Defs.' Resp. at 10-11.) We have already

construed claim 1 and limited the claim to the self-mounting device rather than a combination of the self-mounting device and the surface to which it is affixed. That construction disposes of Chervon's first non-infringement argument.

With respect to Chervon's second non-infringement argument, we have construed the term "uneven" as "sufficiently non-smooth to allow for the influx of air around a suction cup." Chervon argues that its device does not infringe because its Operator's Manual recommends its "smooth surface suction cup base" for use on "mostly smooth or lightly textured surfaces" and recommends a separate base for use on rough surfaces. (*Id.* at 10.) Myerson tested the accused device on the specific surfaces listed in the Pando patent—tiles with grout between them, brick, and cinder block—and found that the suction base was inoperable on those surfaces. (R. 15, Defs.' Exs., Ex. A, Myerson Decl. ¶ 30.) He concluded that the Chervon device "does not function with surfaces of modest unevenness." (*Id.* ¶ 31.) Myerson does not explain, however, why a motorized suction cup is recommended—and indeed, necessary—for use with lightly textured surfaces such as painted walls unless that device is needed to remove an undesired influx of air. He gives no explanation for why lightly textured surfaces do not qualify as uneven surfaces. Karvelis, on the other hand, explained that painted drywall is an uneven surface that allows for the influx of air. (R. 37-2, Supp. Karvelis Decl. ¶¶ 10-11.) Additionally, as discussed in our claim construction analysis, the Pando patent does not limit "uneven surfaces" to those which are spelled out in the patent specification. Thus, Myerson's conclusion that the Chervon device does not work on those surfaces is not an infringement defense.

We find, based on all of the evidence presented, that Techtronic has a reasonable likelihood of prevailing on its infringement claim. As Karvelis noted, each element of the Pando

patent exists in the Chervon device. It is clear from the testimony of both experts that the

Chervon device's suction cup base is intended for use on surfaces that allow for an influx of air.

As a result, the Chervon device's suction cup base functions with uneven surfaces as we have

construed that term here. Because we find that Techtronic has a reasonable likelihood of

demonstrating direct infringement at trial, we need not address its inducement of infringement

argument. Instead, we will proceed to the remaining preliminary injunction factors.

## II.    Irreparable Harm

Because Techtronic has clearly shown a reasonable likelihood of success on the merits of

its claims, it is entitled to a rebuttable presumption of irreparable harm. *Oakley*, 316 F.3d at

1345 (noting that even where merits are close, where they favor the moving party that party is

entitled to the irreparable harm presumption); *see also Amazon.com*, 239 F.3d at 1350.

> It is well-settled that, because the principal value of a patent is its statutory right to
> exclude, the nature of the patent grant weighs against holding that monetary damages
> will always suffice to make the patentee whole. The patent statute provides
> injunctive relief to preserve the legal interests of the parties against future
> infringement which may have market effects never fully compensable in money.

*Hybritech*, 849 F.2d at 1456-57.

Techtronic has introduced evidence that supports a finding of irreparable harm. For

example, James Winn—Techtronic's Senior Vice President of Sales and Marketing for its power

tool division—submitted a declaration stating that its exclusive arrangement with The Home

Depot for the marketing and sales of the AIRgrip™ is based on Techtronic's representations that

its product is patent-protected. (R. 17, Pls.' Mem., Ex. 4, Winn Decl. ¶¶ 8-9, 16.) Winn asserts

that the introduction of infringing products to the market could damage its reputation and

relationship with The Home Depot. (*Id.* ¶ 25.) Winn also testified that Chervon's introduction

of the accused device through Sears could impact Techtronic's market share for its patented product. (*Id.* ¶ 22.) Moreover, Techtronic submitted evidence that Sears is one of its customers and that without a preliminary injunction Techtronic may be put in the position to sue Sears to prevent infringement. (*Id.*, Ex. 6, Bettencourt Decl. ¶ 9.) The resulting harm to its business relationship with Sears would be difficult to compensate through monetary measures.

Chervon challenges irreparable harm on three fronts. First, Chervon argues that there is no evidence that the AIRgrip™ is covered by the Pando patent. (R. 21, Defs.' Resp. at 12.) Richard Pando, however, submitted a declaration in which he states that he negotiated an exclusive license for his patent with TTi. (R. 17, Pls.' Mem., Ex. 5, Pando Decl. ¶ 4.) Pando also declared that after TTi introduced the AIRgrip™, Stanley Tools contacted him to discuss his patent but he informed them that he had an exclusive relationship with TTi. (*Id.* ¶ 6.) James Winn also submitted a declaration stating that during negotiations with The Home Depot for sales of the AIRgrip™, TTi informed The Home Depot of its exclusive license to the Pando patent, and that this patent covered the AIRgrip™. (*Id.*, Ex. 4, Winn Decl. ¶¶ 8-9.) We find this evidence sufficient at the preliminary injunction stage to establish that the Pando patent covers the AIRgrip™ product.

Second, Chervon argues that Techtronic will not suffer irreparable harm because there already are a large number of competing products in the marketplace. (R. 21, Defs.' Resp. at 12.) There is no evidence, however, that any of the competing products are laser levels that include a motorized suction cup. The motorized suction feature is what Techtronic argues makes the AIRgrip™ unique in the marketplace. Finally, Chervon argues that it is sufficiently capitalized to pay any monetary judgment that might result from this litigation. (*Id.* at 13.) Chervon's

ability to pay, however, does not mitigate against the potential harm to Techtronic's business relationship with Sears or reputation in the marketplace that could result in the absence of a preliminary injunction. *See, e.g. Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992) (noting that damage to reputation and loss of good will are intangible harms for which it is "virtually impossible to ascertain the precise economic consequences"). For all of these reasons, we find that the irreparable harm factor weighs in favor of a preliminary injunction.

## III.     The Balance of Harms

Under the third factor of the preliminary injunction test, we must weigh the harm that will occur to Techtronic if the preliminary injunction is denied against the harm that Chervon will incur if the injunction is granted. *See Hybritech*, 849 F.2d at 1457. We recognize that the requested preliminary injunction would cause substantial hardship to Chervon, which represents that it has already manufactured tens of thousands of the accused device. As a result, Chervon will undoubtedly incur financial loss from the delay in sales of those products if a preliminary injunction is granted. It will also incur damage to its reputation with Sears based on its inability to provide the promised products in time for the upcoming holiday sales season. In the absence of preliminary injunctive relief, Techtronic faces financial loss in the form of reduced sales from the competition of a potentially infringing product. It also faces the possibility of having to take action against Sears, which could ruin its business relationship with that company. Balancing these harms against each other, we find that this factor weighs only slightly in favor of Techtronic, which is operating pursuant to a valid patent. *See id.*, 1457-58 (upholding grant of preliminary injunction even where district court found that neither party had a clear advantage under this factor).

## IV.   The Public Interest

In the typical patent case, there is a public interest in enforcing the protections secured by valid patents. *Id.* at 1458. For purposes of the preliminary injunction analysis, we ask "whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Id.* Chervon argues that a preliminary injunction would injure the public interest in promoting business competition. (R. 21, Defs.' Resp. at 15.) While the public interest in competition is certainly a strong one, the protection of valid patents encourages innovation and thus furthers that interest. Chervon admits that "there are already a large number of competing products in the marketplace," (*id.* at 12), which dilutes its argument that a preliminary injunction threatens the public's interest in competition. The evidence showing Techtronic's likelihood of succeeding on the merits of its infringement claim also supports its argument that the public interest in patent protection is on its side. As a result, we find that the public interest factor weighs in favor of granting Techtronic's motion.

## CONCLUSION

After careful consideration of the arguments on both sides of this matter, we find that Techtronic has shown that all four factors of the preliminary injunction analysis weigh in its favor and that the extraordinary remedy of preliminary injunctive relief is warranted. As a result, we grant Techtronic's motion for a preliminary injunction. (R. 13-1.) We remind the parties that this is a business dispute best resolved through the settlement negotiations of competent counsel. As such, the parties are strongly encouraged to exhaust any settlement possibilities before the next status hearing in this case, which will be held on October 12, 2005, at 9:45 a.m.

For the reasons set forth herein, this Court preliminarily enjoins Chervon—as well as its officers, agents, servants, employees, and attorneys—from making, using, offering to sell, or selling within the United States the Accu-line Laser Trac™ Level Model 48253.

ENTERED:

**Judge Ruben Castillo**
**United States District Court**

**Dated: October 6, 2005**